**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Jane Doe,<br>                Plaintiff | PLAINTIFF'S COMPLAINT |
| v. | CIVIL ACTION NO. |
| The Perkiomen School<br><br>                Defendant. | **JURY TRIAL DEMANDED** |

## ORIGNAL CIVIL ACTION COMPLAINT

This is a Complaint initiated by Plaintiff Jane Doe (a pseudonym), by and through her attorneys, Anapol Weiss, against Defendant, The Perkiomen School, alleging as follows:

### I.   Statement of the Case

1.     This lawsuit is about an educational institution that had special duties and obligations to protect its students from sexual abuse and to keep its campus secure. The complete and utter failure of that educational institution to fulfill such duties and obligations resulted in the horrific sexual abuse of one of their own boarding students during her senior year of highs school, a most vulnerable and impressionable time in her life.

### II.   The Parties

2.     Plaintiff Jane Doe ("Plaintiff") is an eighteen-year-old female and former student of The Perkiomen School. Plaintiff's identity and address are not disclosed herein because of her desire to keep confidential her identity and address because she is a victim of nonconsensual sexual contact as outlined herein.[1] Plaintiff may be contacted through the undersigned counsel.

---

[1] Plaintiff will be filing a Motion for Leave of Court and for Permission to Proceed by Pseudonym following the filing of the instant Complaint.

3.      Defendant, The Perkiomen School ("Perkiomen"), is a private high school for both boarding and non-boarding day students alike located in Montgomery County, Pennsylvania.

4.      At all relevant times hereto, Defendant Perkiomen acted by and through its duly authorized actual and/or apparent agents, servants, and employees, within the course and scope of their actual and/or apparent agency and/or employment including but not limited to Head of School Mark Devey, Assistant Head of School for Student Life Amber Goupil, and Director of Safety and Security Don Bell.

5.      Defendant Perkiomen, through the above-referenced employees, agents, and servants, had the authority and responsibility to maintain a safe and secure campus including addressing harassment (sexual or otherwise) and to institute corrective measures.

6.      Perkiomen had actual or constructive knowledge of the fact that students would leave their housing placements after "lights out" hours to visit with other students, particularly at the end of the school year. Perkiomen also had actual or constructive notice of harassing and inappropriate conduct on the part of the student who assaulted Plaintiff,[2] but despite such knowledge, failed to adequately respond to the prior reports of assault, which resulted directly in the severe assault of Plaintiff.

7.      Defendant Perkiomen was responsible for the promulgation and enforcement of all policies, customs, practices, and policies within the private high school, including its security measures.

8.      Perkiomen had actual or constructive knowledge of clear security and safety issues throughout campus yet either took no precautions or inadequate precautions to remedy the same and protect students from gross and obvious overnight security deficiencies.

---

[2] The identity of the assaulting student is known by and between the parties and hereinafter referred to as "Perpetrator."

2

9.      Upon information and belief, Perkiomen was not in a contractual relationship with any third-party contractors responsible for the safety and oversight of the students on campus.

**III.    Jurisdiction and Venue**

10.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1332 and 1441(a) as diversity jurisdiction exists. Plaintiff is a citizen of Belgium, Defendant is a citizen of Montgomery County, Pennsylvania, where it is based and operates, and the amount in controversy, without interest and costs, exceeds $75,000.

11.     This matter is being brought within the statute of limitations consistent with 42 Pa. C.S.A. §5533(b).

12.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2), as the causes of action against Defendant relating to Plaintiff arose in this judicial district, a substantial part of the event which give rise to the claims herein occurred in this district, and Defendant Perkiomen is located in this judicial district.

13.     This Court has personal jurisdiction over Defendant Perkiomen because Perkiomen is located and is effectively "at home" in the Commonwealth of Pennsylvania within Montgomery County.

**IV.    Statement of Facts**

  **A.   The Inadequate Security at the Perkiomen School**

14.     Through its website, Perkiomen boasts that it "provides high visibility, professional, and courteous service." The Safety and Security Department's role is to "ensure a safe, secure, and friendly, educational environment for all students, faculty, staff, and visitors of Perkiomen School. [3]

---

[3] *See* https://www.perkiomen.org/campus-life/security

15.     Consistent with this representation, the 2023-2024 Community Handbook for the School contains a Sexual Harassment policy that provides that "[s]exual harassment of any type is unacceptable and is considered a major violation of school rules" and, without defining what constitutes "appropriate action," the handbook further provides: "Any instance of sexual harassment must be reported to the Assistant Head of School for appropriate action." A true and correct copy of the 2023-2024 Perkiomen School Community Handbook is appended hereto as **Exhibit "A."**

16.     Similarly, with respect to alcohol and drug use, the handbook provides that drug and alcohol use is a "threat to the safety and health of students, faculty, staff and the community" and "can cause physical harm." While it is noted that students must not possess, use, be under the influence of or provide to any other student by sale or any other means, any substance, including alcohol beverages, it is again noted that possession of any of the above substances is a violation of Major School Rules and, again, without defining what constitutes "appropriate action," will be handled accordingly. *See id.* at 48.

17.     Notably, while there is an express Zero Tolerance Policy for racist, sexist, homophobic and discriminatory behavior, there is no express zero tolerance policy in the handbook for sexual abuse. There is likewise no reference to sexual abuse awareness and prevention training, mandatory or otherwise, for students to undergo mentioned in the handbook. *See* **Ex. "A."**

18.     At all relevant times hereto, the Perkiomen School was not adequately patrolled by security personnel to ensure the safety of members of the student population and others on campus.

19.     At all relevant times hereto, the key card system used by those residing on campus to enter and exit boarding quarters was often times not functioning properly and was not monitored by on-campus police or other security personnel. Thus, throughout the 2023-2024 school year, key cards were often either not required or malfunctioning.

20.     At all relevant times hereto, no security alarm system was in place within the buildings where boarding students resided throughout the 2023-2024 school year.

21.     At relevant times hereto, house parents were assigned to look after students who were living on campus. It was common knowledge amongst students, however, that house parents would *not* be in position to prevent them from departing from their housing units after certain hours and the outlined designated "lights out" time passed.

22.     In other words, there was no true "overnight" house parenting system in force and effect on campus whereunder house parents or other supervisors were in positioned to monitor hallways and points of ingress and/or egress.

23.     At relevant times hereto, security and surveillance cameras were often not functioning throughout campus.

24.     At all relevant times hereto, doors and windows were also left unlocked throughout living quarters occupied by boarding students.

25.     At all relevant times hereto, while the school employs a Director of Safety & Security, there were either no overnight security personnel assigned to patrol campus and monitor foot traffic or an extremely limited number of such personnel were positioned to do so that was grossly inadequate based on the number of security personnel to boarding student ratio.

26.     Likewise, upon information and belief, there was no emergency phone number made available to students to call in the event of an emergency on campus or to report and respond to safety threats during overnight hours.

27.     At all relevant times hereto, prior to May 2024, numerous students publicly raised safety and security concerns with the school. In fact, an anonymous account was created on the "X" platform, previously known as Twitter, which encourages students to report instances of sexual abuse and neglect at the school.

28.     At all relevant times hereto, it was *not* common for the Upper Perkiomen Police Department to travel throughout campus in the evening and early morning hours.

29.     At all relevant times hereto, it was however a wholly foreseeable and frequent practice for students to leave their dorm rooms to visit with other students, engage in underage drinking, and participate in other forms of fraternization.

30.     At all relevant times hereto, it was either well known or should have been known that students purchased alcohol underage and brought it back to Perkiomen for consumption on campus.

31.     At all times relevant hereto, the students receive a copy of the School Community Handbook at the onset of the school year. However, no practical training is provided to students on sexual abuse awareness and prevention and no mechanisms for the anonymous reporting of sexual abuse are made readily known to students.

32.     Upon information and belief, the frequency of underage drinking was well known to Mr. Devey, Ms. Goupil, Mr. Bell, and other supervisors, as room raids were performed during the 2023-2024 school year.

33.     Following those raids, large amounts of alcohol were recovered. For those from whom alcohol was confiscated, the penalty was typically not severe. Some students received warnings. Others were put on dorm arrest for a limited period which prevented them from leaving their room after school and dining hours, and others received no formal reprimands.

34.     Similarly, students would leave their living quarters after hours to visit with other students, including members of the opposite sex. Here too, for those caught leaving their living quarters after hours, some students received warnings, other were put on "dorm arrest" for a limited period, which prevented them from leaving their room after school and dining hours, and others did not receive formal reprimands.

35.     Upon information and belief, for those found engaging in underage drinking and/or fraternization after hours who were highly regarded student athletes, the penalties were less severe than those who did not fall within the athletically skilled category.

36.     Perkiomen's lack of security measures, and mild consequences for delinquency fostered an environment that enabled and positioned students to breach school policy and instilled in students a culture amongst boarding student whereunder leaving their living quarters after hours was conduct that occurred so frequently and consistently without substantial deterrent or reprimands that it was effectively condoned and ratified by Perkiomen.

**B.  The Subject Events**

37.     At all times relevant hereto, Plaintiff was a full-time boarding student at Perkiomen and a minor at only seventeen years of age throughout the duration of the 2023-2024 school year. She was a senior at the time.

38.     Perpetrator was also a senior boarding student at the school. He was a promising student athlete whose athletic capabilities were recognized publicly by Perkiomen.

39.     By contrast, it was known by Perkiomen that Plaintiff would not be pursuing basketball, the sport she was engaged in at Perkiomen professionally upon graduation.

40.     Throughout the school year, Plaintiff boarded at Kolbe Hall and Perpetrator boarded at Kriebel Hall. The two boarding quarters were not far apart from one another.

41.     At the onset of the school year, it quickly became apparent to Plaintiff that the boarding students engaged in underage drinking on a frequent and consistent basis. This remained the case throughout the school year.

42.     By the close of the school year, students were emboldened and familiarized with the process of leaving their dorms after hours, a consistent and common occurrence that school administration either knew or should have known was taking place at large.

43.     Consistent with this routine practice for many boarding students, including many upper-class students, Plaintiff accepted an offer from Perpetrator for him to purchase alcohol for her.

44.     Per his request, she and several friends planned for Plaintiff to visit Perpetrator's dorm room on the early morning hours of Sunday, May 5, 2024 to pick up the alcohol.

45.     When Plaintiff arrived, his roommate was not present.

46.     Perpetrator handed her a bottle of New Amsterdam Peach Vodka and asked Plaintiff to watch a movie with him. Plaintiff acquiesced.

47.     A few minutes into the movie, Perpetrator attempted to kiss Plaintiff, and she directly pulled away.

48.     She firmly told Perpetrator "*No*," and that nothing was going to happen between them. Perpetrator then told her to "relax" for the first of many times that morning.

49.     Perpetrator nonetheless continued his clearly unwanted advances.

50. Plaintiff told Perpetrator that he was "too drunk," which Perpetrator responded by defiantly taking and passing a sobriety test.

51. Plaintiff, further demonstrating her desire not to engage in any sexual contact with Perpetrator, advised that she had just gotten out of relationship and was not interested in "doing anything" to which Perpetrator responded, "okay."

52. Nonetheless, Perpetrator forcibly French kissed Plaintiff, and she again pulled away.

53. Perpetrator then proceeded to suck on Plaintiff's neck and kiss her stomach despite her clear protests and her forceful push of his hand off her breast area.

54. Perpetrator suddenly grabbed Plaintiff by her neck firmly, pulled down her pants and underwear, and violently digitally penetrated her.

55. Perpetrator then forced oral sex upon Plaintiff.

56. While on top of Plaintiff, Perpetrator demanded that she pleasure him as he did to her.

57. Plaintiff then had a panic attack, bursting into tears.

58. Perpetrator questioned why Plaintiff was crying and stated that Plaintiff was "accusing him of sexual assault," but his mother raised him to be a gentleman, so he would "never do that."

59. Plaintiff desperately tried to reach a friend to assist her in leaving Perpetrator's room but was not met with any responses. As such, she lied dormant in great fear of further assault until departing to return to her room.

C. **Perkiomen's Gross Mishandling of the Assault**

60.    The next day, May 6, 2024, Plaintiff bravely disclosed the assault to her advisor. Her advisor was appreciative that the abuse was conveyed and informed Plaintiff that her advisor would need to further report the assault to her own supervisors, including Ms. Goupil.

61.    When Ms. Goupil learned of the report of abuse from Plaintiff, she met with Plaintiff and instructed her to inform her mother of the events.

62.    Plaintiff turned over the bottle of alcohol provided to her by Perpetrator to Ms. Goupil and expressed concerns that the alcohol was spiked. However, Plaintiff never learned whether any efforts were made by Perkiomen to ascertain whether Rohypnol or any other controlled substances were found within the bottle.

63.    Upon information and belief, Defendant Perkiomen reported the assault to Child Protective Services and local police.

64.    No medical examination of Plaintiff was performed nor was she encouraged to seek more than a single visit with a counselor to address the assault.

65.    She also verbally assured Plaintiff that she was ***not going to get in trouble*** and that the assault ***was not her fault***. She further represented to Plaintiff that she would advise Plaintiff once Perpetrator was confronted regarding the assault.

66.    However, much to Plaintiff's great fear, instead of reporting back to Plaintiff after Perpetrator was confronted, Ms. Goupil merely responded to a text message sent by Plaintiff by stating that Plaintiff would not see Perpetrator if she traveled to communal areas. She also instructed Plaintiff to keep the subject events quiet.

67.    Naturally, Plaintiff was terrified to leave her dormitory the next day out of fear of seeing Perpetrator. She eventually learned that he had been sent home by this point but was never directly informed that was the case by Perkiomen administration.

68. Her nerves prevented her from eating before taking her AP Psychology examination.

69. Upon completion of her exam, Plaintiff was utterly shocked to find out from her mother that she was being forced to leave Perkiomen prematurely, by Saturday May 11, 2024, before her scheduled conclusion of the school year.

70. Plaintiff was completely devastated and disheartened by this news, especially considering the false assurances provided by Ms. Goupil and the established precedent where students were either not penalized or placed on temporary dorm arrest after leaving their dorm rooms and/or engaging in underage drinking after hours.

71. E-mail correspondence indicated that Perkiomen did not want to "support" Plaintiff, and that she was "in the realm of discipline." The school explained further that because a leave of absence was required, the same rules applied as if she were suspended or expelled.

72. Plaintiff's forced premature departure left Plaintiff with no choice but to miss her AP Pre-calculus examination which was scheduled to take place two days after the date she was required to leave the school. She was also forced to incur an additional six hundred Euros and to arrange for her luggage to be picked up early as she was not prepared to leave the school until after graduation.

73. Perkiomen also initially advised Plaintiff she would not be receiving her diploma until after graduation.

74. She was also initially told by the administration that if she did not promptly depart from the school, her departure could be treated as an expulsion rather than a leave of absence. This narrative was subsequently altered from a withdrawal of the privilege of "saying goodbye to friends" to a representation that she would "be safer at home" and away from "social stigmas"

11

associated with the assault (even though, unbeknownst to Plaintiff, Perpetrator had already been removed from campus).

75.     Once Plaintiff made it home to Europe, she began to have nightmares and was forced to address feelings of revictimization she experienced because of being forced to abruptly leave the school.

76.     Plaintiff felt punished for being assaulted and having the courage to come forward thereafter, an act which she performed to protect others from facing similar sexual abuse on campus.

77.     In the following days, Plaintiff's mother received a call from Head of School Mr. Devey apologizing for the turn of events. At mailing costs incurred by Plaintiff, she was sent her diploma.

78.     Mr. Devey also invited Plaintiff to walk at graduation, which she did. The school assumed the costs for her and her mother to fly to Perkiomen to attend graduation. By this time, however, she was already humiliated, punished for disclosing the abuse, and physically and emotionally scarred from the initial abuse and subsequent lack of support she received from the school after bravely deciding to disclose the abuse for the betterment of other students and the community at large.

79.     Plaintiff was placed in an unnecessarily vulnerable position due to the poor security at Defendant Perkiomen and then met with a pure lack of support after fostering the courage to come forward and face the nightmare she experienced heard on.

80.     As a direct and proximate result of Perkiomen's conduct described herein, Plaintiff was caused to suffer and will continue to suffer emotional and physical injuries, including but not limited to abdominal pain, sleep disturbance, fatigue, depression, anxiety, poor

concentration, dizziness, sweating, racing heart, shock, PTSD, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

81.     Plaintiff has also suffered irreparable harm in the form of an increased loss of independence, difficulty maintaining interpersonal relationships and distrust in peers and authority figures, and feelings of emotional numbness, psychological damage as well as great feelings of hopelessness, detachment, an inability to concentrate, embarrassment, fear, shame, and loss of self-worth requiring ongoing medical treatment, the necessity for medications and counseling.

82.     She has further suffered a severe impairment and disruption of her enjoyment of life, identity, and belief structure, fatigue, sweating and racing heart. Plaintiff has also suffered a decreased pleasure in the activities she once enjoyed.

83.     The abuse set forth above and its consequential trauma and harm, in turn, caused Plaintiff to suppress and/or emotionally dissociate her feelings about her traumatic experiences, thereby exacerbating their devastating psychological, physical, and social consequences.

84.     Plaintiff was not fully aware of the causal relationship between the abuse set forth above, and its resulting trauma and harm, until recently, and continues to endure and/or discover trauma and harm relative to the abuse at the present time, which inflictions of trauma and harm shall and will continue well into the future.

**D.  <u>Prior Instances of Abuse and Neglect at Perkiomen</u>**

85.     Tragically, there exists a history and uncorrected pattern of sexual violence, and inadequate security at Perkiomen plaguing Perkiomen's student and community members on campus grounds.

86.     There is an entire Twitter account devoted to instances of sexual abuse and misconduct at Perkiomen.

87.     In fact, in the days preceding the assault of Plaintiff, another female student, approximately 15 years old at the time, came forward and disclosed that she was assaulted by Perpetrator. Despite the victim being assured by the school administration that her identity would remain anonymous, she received text messages from Perpetrator suggesting that he was aware of the report.

88.     The prior victim was not made aware of any disciplinary action taken towards Perpetrator or any result of her report. Had appropriate action been taken regarding the initial assault that was reported prior to Plaintiff's assault, Plaintiff would not have faced similar egregious conduct by the same Perpetrator.

89.     Additionally, upon information and belief, it is known amongst the Perkiomen student body that earlier in the school year, in approximately February 2024, uninvited penetrative sexual contact was made by one child of a staff member who was approximately 13 years of age on another child of a staff member who was approximately 5 years of age on campus in a bathroom.

90.     There is also a pattern and practice of faculty members failing to adequately report and handle instances of sexual abuse. In fact, a CBS news article published in January 2015 discussed a prior lawsuit wherein Head of School, Mr. Devey, was alleged to have failed to

publicly report instances of sexual abuse at a prior place of employment, a boarding school in Connecticut.[4]

91.     These are but a few examples of prior sexual misconduct that Perkiomen permitted or enabled to take place, uncorrected, on campus without adequate consequences prior to the entirely preventable and violent assault Perkiomen positioned Plaintiff to endure. This pattern also demonstrates that Perkiomen knew or should have known that late night and early morning fraternization was an issue on campus that left students like Plaintiff vulnerable to harassment, assaults, and other violent behavior and the need to proactively address the issue.

92.     In addition to the aforementioned instances of abuse that occurred on campus, it is well known that sexual violence is rampant at high school throughout the county and needs to be proactively addressed by those responsible for safeguarding our nation's children.

93.     In fact, a November 2023 Data Snapshot on Sexual Violence and Sex-Based Harassment or Bullying in the U.S. for Public Schools during the 2020-2023 school year published by the U.S. Department of Education Office for Civil Rights indicated that school districts nationwide reports 2,700 incidents of sexual assault.[5] Naturally, In light of these statistics even as a private school, Perkiomen knew of the very real possibility of sexual violence erupting at its boarding school.

94.     Now, in conformity with Pennsylvania law, Plaintiff brings the following action for damages.

95.     As alleged in greater detail herein above and/or below, all of Plaintiff's harm and damages were caused by the culpable acts and/or omissions of Defendant Perkiomen.

## COUNT I

---

[4] *See* https://www.cbsnews.com/newyork/news/conn-boarding-school-accused-of-not-reporting-sexual-assaults-of-students/.
[5] *See* https://www2.ed.gov/about/offices/list/ocr/docs/crdc-sexual-violence-snapshot.pdf

## NEGLIGENCE
### Plaintiff v. The Perkiomen School

96.     Plaintiff incorporates herein by reference all paragraphs of this Complaint the same as if fully set forth hereinafter.

97.     At all relevant times, Defendant Perkiomen owed a duty to maintain a safe school environment for the students attending the school, specifically Plaintiff.

98.     At all relevant times, Defendant Perkiomen had a duty to protect and safeguard Plaintiff from harm and danger, such protection included ensuring security cameras were functioning throughout communal areas and overnight security staff were employed and present for the entirety of the school year.

99.     At all relevant times, Defendant Perkiomen had a duty to ensure that its students were not sexually abusing other students and, specifically, that its inadequate security measures and mild punishment practices did not allow students to engage in unsafe activities.

100.    At all relevant times, Defendant Perkiomen had a duty to provide Plaintiff with a safe and fair educational environment.

101.    The negligence, carelessness, willful and wanton conduct, and recklessness of Defendant Perkiomen and its agents, servants, and/or employees, which were the proximate cause of the assault described herein and the injuries suffered by Plaintiff, consisted of, but are not limited to, the following:

   a.   Failing to enforce and/or follow adequate policies and procedures, including the sexual harassment, alcohol, and drug policies, for the protection and reasonable supervision of Plaintiff, who attended Defendant Perkiomen, and/or, in the alternative, failing to implement and comply with such procedures which had been adopted;

   b.   Failing to provide proper security at the school, including buildings where boarding students are housed, in the events leading up to the horrific assault of Plaintiff;

   c.   Failing to have an adequate number of security personnel on the school property;

d.  Failing to have an adequate number of security personnel in the school hallways, classrooms, and spaces used for extracurricular activities;

e.  Failing to install an adequate number of security cameras in the schools;

f.  Failing to ensure that the school's surveillance videos were reviewed;

g.  Failing to ensure the existing security cameras in the school were adequately and properly functioning;

h.  Failing to have proper policies in place for the training of security personnel;

i.  Failing to have proper policies and procedures in place for the hiring of security personnel;

j.  Failing to adopt security measures that were necessary and reasonable to protect and/or safeguard students on the property, such as Plaintiff;

k.  Failing to provide a safe place for the students they serve;

l.  Failing to exercise reasonable care for Plaintiff's safety and the safety of others;

m.  Failing to provide and maintain a safe and secure premises;

n.  Creating and enabling a culture wherein it was acceptable for students to violate safety policies and fraternize after "lights out" hours;

o.  Failing to take any of the above steps despite prior, actual knowledge of instances of sexual abuse by the same Perpetrator in the days leading up to Plaintiff's horrific assault;

p.  Failing to oversee and/or supervise existing security measures to ensure that such measures were being properly implemented and performed;

q.  Failing to improve existing security measures that the Defendant Perkiomen knew or should have known were inadequate and ineffective;

r.  Failing to provide reasonable and adequate instruction and/or supervision to employees, agents, representatives, servants, and/or security personnel in connection with the safe operation and management of the school;

s.  Failing to adequately investigate previous complaints regarding Perpetrator and act accordingly based on the suspicious presence of Perpetrator;

t.  Failing to warn or take any specific action to prevent further violent incidents at the school, despite actual knowledge of the prior misconduct/inappropriate behavior carried out there by Perpetrator;

u.  Negligently maintaining custody, supervision and protection of youth placed in its care by virtue of its legal authority;

v.  Failing to prevent the abuse of student residents by other student residents;

w.  Failing to intervene in or otherwise prevent the assault of Plaintiff despite actual, prior knowledge of previous sexual assaults occurring on school grounds and prior knowledge of students routinely leaving their living quarters after hour;

x.  Failing to adequately address Plaintiff's emotional and physical needs following her disclosure of the subject assault;

y.  Inappropriately penalizing Plaintiff by means disproportionate to those imposed upon other students for similar conduct and focusing on her breach of school policy instead of her victimization and need for medical and psychological treatment and supports following an abrupt and unexpected sexual assault by a fellow student at a time when her familial support system was situated halfway across the world in a foreign country;

z.  Forcing Plaintiff to prematurely conclude the school year and failing to advise as to the whereabouts of Perpetrator following the assault;

aa. Failing to exercise due care under all circumstances; and

bb. Alternatively, concluding that Plaintiff consented to sexual activity under circumstances in which it was unreasonable to have reached that conclusion because of Plaintiff's resistance, inability to provide consent and/or incapacitation.

102.  Defendant, Perkiomen, was negligent under the facts as detailed within this Complaint in that this Defendant failed to use the degree of care, precaution and vigilance which a reasonably prudent person or entity would use under the same or similar circumstances, including, but not limited to, the negligent affirmative acts detailed in this Complaint which a reasonably prudent person or entity would not have done, and also the negligent omission or failure to act and/or take precautions as detailed in this Complaint which a reasonably prudent person or entity would have done or taken under these circumstances.

103.    Defendant Perkiomen is vicariously liable for both the negligent acts of its house parents, security personnel and other employees or agents responsible for overseeing Plaintiff to protect Plaintiff from the foreseeable risk of harm posted by Perpetrator, where it is widely known that there were security deficiencies on campus and Perpetrator displayed inappropriate behavior towards women. This is particularly true where there a public policy to protect youth from victimization and revictimization, by imposing a responsibility upon those individuals and institutions in the best position to know of and stop the abuse of students, such as Perkiomen herein.

104.    By reason of the Defendant Perkiomen's carelessness, negligence, willful and wanton conduct, and recklessness, as aforesaid, Plaintiff has sustained serious and permanently disabling psychological injuries as more fully set forth above and incorporated here for reference.

**WHEREFORE**, Plaintiff, Jane Doe, demands judgment against Defendant, Perkiomen, in an amount in excess of Fifty Thousand Dollars ($50,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, punitive damages, and such other legal and equitable relief as the Court deems appropriate.

**COUNT II**
**NEGLIGENT HIRING, TRAINING, SUPERVISION, RETENTION &**
**COORDINATION OF RESOURCES**
**Plaintiff v. The Perkiomen School**

105.    Plaintiff incorporates herein by reference all paragraphs of this Complaint the same as if fully set forth hereinafter.

106.    Defendant Perkiomen had a duty to provide reasonable supervision of the students under its care.

107.    Defendant, Perkiomen also owed a duty to exercise reasonable care in the hiring, certifying, assignment, control, selection and/or retention of staff members, teachers, counselors,

employees, agents, servants, representatives, and/or ostensible/aided agents, situated in and/or located at Perkiomen and specifically a duty to be on high look out for possible abusers, and others seeking to take advantage of students under Perkiomen's care.

108.    Defendant Perkiomen leadership staff also had a duty to provide reasonable observation, management, supervision and direction of its employees and agents, and to make sure they were acting in any and all efforts to protect the youth under their care.

109.    Defendant Perkiomen owed a duty to exercise reasonable care in the selection and retention of staff, training of staff, and to reject and/or terminate the employment of individuals incapable, unqualified, or unfit to care for and/or supervise students.

110.    Defendant, Perkiomen, knew or should have known prior to and/or contemporaneous with the relevant time frame during which Plaintiff was sexually abused of the particular risk posed by Perpetrator, that Plaintiff and other students affiliated and/or associated with Perkiomen were vulnerable to and potential victims of sexual and/or physical and/or emotional abuse based on, among other things, Perpetrator's reported prior inappropriate and/or questionable misconduct, and history of sexually and/or physically and/or emotionally abusing other students.

111.    It is reasonably foreseeable that unmonitored and unsupervised students are at an increased risk of harm.

112.    Defendant Perkiomen, by and through its agents, servants, and employees, knew or reasonably should have known of its staff members' inadequacies and restrictions with regard to supervision.

113.    Despite such knowledge, Defendant Perkiomen breached its duty to provide reasonable supervision of staff members, who were in the position of trust and authority as

supervisors, teachers, surrogate parents, and/or authority figures, thereby enabling Perpetrator's wrongful acts against Plaintiff.

114.     Defendant Perkiomen failed to exercise reasonable care in the selection of and retention of various staff members by the following:

a.  Negligent hiring, certifying, assigning, observation, retaining, supervision, management, oversight, direction, administration, and/or otherwise control of staff members and/or counselors and/or teachers in the employ of Perkiomen;

b.  Failing to use due care in the selection of staff members and/or teachers rendering service(s) when standing *in loco parentis*;

c.  Permitting staff to violate policy and the law;

d.  Failing to learn of or investigate the proclivity towards sexual and/or physical and/or emotional abuse of Perpetrator and prevent him from accessing other students, particularly female students until the investigation was completed;

e.  Failing to recognize and/or appreciate that other students, who were not properly supervised, were exposing students entrusted to Perkiomen, like Plaintiff, to sexually abusive and/or exploitive conditions;

f.  Failing to perform its obligations and responsibilities in *loco parentis*;

g.  Recklessly, negligently, and/or carelessly failing to train, observe, and supervise Defendant Perkiomen's staff members;

h.  Recklessly, negligently, and/or carelessly failing to monitor, observe, and supervise Defendant Perkiomen's students;

i.  Recklessly, negligently, and/or carelessly failing to implement and enforce policies and procedures to prevent sexual and physical misconduct, exploitation, and assault against students, like Plaintiffs, entrusted to it;

j.  Failing to conduct a thorough pre-hiring interview with Defendant Perkiomen staff members about their job responsibilities including the need to closely monitor students and failing to continually oversee Defendant Perkiomen staff involvement with students like Plaintiff; and

k.  Failing to account for the need for increased security after "lights out" hours, particularly at certain times of the year, including towards the close of the academic year.

115.    As a result of the Defendant Perkiomen's conduct, as outlined herein, Plaintiff was violated and forced to undergo vile atrocious acts of sexual abuse and, as a result, has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; distrust, anxiety, and distress related to authority figures; depression, nightmares, nervousness, stress, and/or other trauma; mental anguish, embarrassment, insomnia, fear, and other emotional distress; were prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained loss of earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

116.    The harms, injuries, losses, and damages suffered by Plaintiff, and that Plaintiff continues to suffer, were directly and proximately caused by the negligence, willfulness, wanton, recklessness, and outrageous conduct of Defendant Perkiomen, individually and by and through its agents, servants, and/or employees, which consisted of, among other things, all conduct described more fully herein.

117.    Because of the grossly negligent, wanton, and outrageous conduct as set forth in this complaint, Plaintiffs are entitled to punitive damages.

**WHEREFORE**, Plaintiff, Jane Doe, demands judgment against Defendant, Perkiomen, in an amount in excess of Fifty Thousand Dollars ($50,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, punitive damages, and such other legal and equitable relief as the Court deems appropriate.

**COUNT III**
**GROSS NEGLIGENCE**
**Plaintiff v. The Perkiomen School**

118.    Plaintiff incorporates herein by reference all paragraphs of this Complaint the same as if fully set forth hereinafter.

119.    Defendant, Perkiomen, was grossly negligent under the facts as detailed within this Complaint in that these abusive employees and Defendant acted with complete disregard of the rights, safety, and well-being of others; in a palpably unreasonable manner; in an outlandish fashion; and/or failed to exercise slight care or diligence under these circumstances.

**WHEREFORE**, Plaintiff, Jane Doe, demands judgment against Defendant, Perkiomen, in an amount in excess of Fifty Thousand Dollars ($50,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, punitive damages, and such other legal and equitable relief as the Court deems appropriate.

**COUNT IV**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**Plaintiff v. The Perkiomen School**

120.    Plaintiff incorporates herein by reference all paragraphs of this Complaint the same as if fully set forth hereinafter.

121.    Defendant Perkiomen had contractual and/or duties in loco parentis owed towards Plaintiff. This included the exercise of reasonable care to protect Plaintiff from harm while under Perkiomen's care.

122.    Defendant undertook gratuitously or for consideration to render certain services and assumed duties to Plaintiff to protect her and/or her educational investment.

123.    To this end, upon information and belief, there were written policies, procedures, protocols, contracts, and agreements entered into by and between Perkiomen, and its agents, servants, and/or employees, and/or Plaintiff in which Perkiomen and its agents, servants, and/or

employees, were to provide certain services and assume certain duties to Plaintiff in exchange for financial consideration paid by or on behalf of Plaintiff.

124.    Upon information and belief, these written policies, procedures, protocols, contracts, and agreements outlined certain rights, responsibilities, obligations and duties of Defendant The Perkiomen School, and its agents, servants, and/or employees related to Plaintiff's education at Defendant Perkiomen, including but not limited to her tuition, housing, other financial matters, security, mental and physical safety and medical treatment, health insurance and parental notifications.

125.    Upon information and belief, these written policies, procedures, protocols, contracts, and agreements incorporated by reference certain written rules, guidelines, and operating procedures of Perkiomen include but are not limited to Perkiomen's Charter, Code of Student Conduct, Code of Academic Integrity and Policies and Procedures Handbook.

126.    At all times relevant herein, Defendant Perkiomen, and its agents, servants, and/or employees, had an obligation, duty, assumption of duty or promise to provide its students, including Plaintiff, dormitories, and housing in exchange for payment.

127.    Upon information and belief, these contracts and agreements incorporated by reference certain written policies, procedures, protocols, contracts, and agreements of Perkiomen.

128.    At all times relevant herein, Defendant Perkiomen, and its agents, servants, and/or employees, had an obligation, duty, assumption of duty or promise to provide its students, including Plaintiff, safe buildings, and a safe learning environment.

129.    At all times relevant herein, Defendant Perkiomen, and its agents, servants, and/or employees, had an obligation, duty, assumption of duty or promise to provide its students, including Plaintiff, medical treatment, and services for physical and mental injuries.

130.    At all times relevant herein, Defendant Perkiomen, and its agents, servants, and/or employees had an obligation, duty, assumption of duty or promise to refer its students, including Plaintiff, for mental health services.

131.    Defendant Perkiomen, and its agents, servants, and/or employees failed to adequately uphold and adhere to the terms of the contracts and agreements and breached those terms.

132.    Under Pennsylvania statutes and regulations, Perkiomen owed Plaintiff an affirmative duty of care to ensure her safety and well-being and provide her with adequate protection and medical care while in its care.

133.    There was a special relationship between Defendant and Plaintiff that included a duty of care for Plaintiff's physical, emotional, and academic well-being.

134.    Plaintiff trusted, relied, and depended on Defendant to exercise fairness and good faith in dealing with Plaintiff and to refrain from using Defendant's positions to Plaintiff's detriment and/or to Defendant's advantage.

135.    Defendant knew or should have known that its acts and omissions involved an unreasonable risk of causing Plaintiff distress and knew or should have known that the distress might result in illness, and/or injuries.

136.    It was reasonably foreseeable that a person in Plaintiff's position would experience severe emotional damage from Defendant's lack of oversight as alleged herein.

137.    Defendant Perkiomen, and its agents, servants, and/or employees unintentionally caused emotional distress to Plaintiff and are liable for her resulting injuries.

138.    Defendant Perkiomen's acts and omissions, including but not limited to herein facts, and those of and its agents, servants, and/or employees constitute negligence.

139.    As a result of Defendant Perkiomen's, and its agents, servants, and/or employees, acts and omissions, Defendants caused Plaintiff severe emotional distress, pain and suffering and physical pain, suffering, and other injuries.

140.    Defendant, Perkiomen, breached its duties by failing to provide Plaintiff a safe environment and exposing her to abusive and violent conduct from which he suffered grave physical and emotional injury.

141.    It was reasonably foreseeable to Defendant Perkiomen's that its conduct as described herein increased the risk of harm to Plaintiff.

142.    As a result of Perkiomen's failure, Plaintiff's emotional harm was so extreme that a reasonable person should not and cannot be expected to endure the resulting stress. The severe emotional harm that Plaintiff suffered includes, but is not limited to: horror, pain, anxiety, worry, shock, severe post-traumatic stress, humiliations, embarrassment, shame, feelings of powerlessness, fear and distrust of authority, severe stress, difficulty sleeping, nightmares, night sweats, depression, emotional withdrawal, and difficulty coping with daily life. Plaintiff continues to struggle, cope, and attempt to heal from his emotional distress.

143.    The aforesaid negligence, carelessness, gross negligence, and reckless disregard for Plaintiff's safety by Defendant Perkiomen, and its agents, servants, and/or employees was a substantial factor in causing and increased the risk of harm and her injuries.

144.     As a result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, guilt, self-blame, doubt, emotional distress, physical manifestations of emotional distress, PTSD, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

145.     Plaintiff has also experienced and will continue to experience depression, nightmares along with feelings of anger, frustration, and resentment. She has sought and continues to seek clinical treatment.

146.     Defendant, Perkiomen's negligence was the proximate cause of Plaintiff's severe emotional distress and harm.

**WHEREFORE**, Plaintiff, Jane Doe., demands judgment against Defendant, Perkiomen, in an amount in excess of Fifty Thousand Dollars ($50,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, punitive damages, and such other legal and equitable relief as the Court deems appropriate.

Respectfully submitted,

**ANAPOL WEISS**

*/s/ Marni S. Berger*
Kila B. Baldwin, Esq.
Marni S. Berger, Esq.
Jillian S. Casarella, Esq.
One Logan Square
130 N. 18th St. Ste. 1600
August 30, 2024                    Philadelphia, PA 19130